United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL DRUMM,

          Plaintiff,

v.

MORNINGSTAR, INC.,

          Defendant.

NO. C08-3362 TEH

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter came before the Court on July 27, 2009, on Defendant Morningstar, Inc.'s motion for summary judgment. After carefully considering the parties' written and oral arguments, the Court GRANTS IN PART and DENIES IN PART Morningstar's motion for the reasons discussed below. The motion is GRANTED as to Plaintiff Michael Drumm's claims based on discrimination and GRANTED IN PART and DENIED IN PART as to Drumm's claims for unpaid wages.

**BACKGROUND**

Michael Drumm was employed by Morningstar as a regional sales director from 2001 until his termination on November 1, 2007. Morningstar provides investment research to individual investors, financial advisors, and institutional clients. Drumm's role as regional sales director was to work with institutional clients on the West Coast to determine what products should be offered to those clients, to determine which specific data elements from those products each client needed, and to negotiate service agreements with the clients. E*Trade and Charles Schwab were among the accounts Drumm handled for Morningstar.

In April 2006, Drumm's immediate supervisor, Connie Resendes, removed Drumm from the E*Trade account. Resendes was already considering rebalancing accounts at that time because Drumm had too many accounts and Diane Wein, another regional sales director, had too few. It is not disputed that Liat Rorer, E*Trade's account representative, was dissatisfied with Drumm. The parties dispute whether Drumm or Resendes initially proposed reassigning the E*Trade account, but Resendes and Drumm ultimately agreed that Wein should take over that account. No other client had complained to Resendes about Drumm, and Resendes attributed the situation with E*Trade to miscommunication or a personality conflict. Notwithstanding Drumm's removal from the E*Trade account, Resendes gave Drumm a positive performance review, including an "exceeds expectations" rating, in July 2006.

During this period, Drumm was experiencing significant change in his personal life. Beginning in 2005, Drumm began discussions with his wife, with whom he had two children, about his sexual orientation. After pursuing counseling, Drumm and his wife decided in 2006 to end their marriage. Their divorce decree did not become final until December 2008, but they reached agreement on property settlement, custody, and all other issues at the beginning of 2007.

While Drumm was in the process of ending his marriage, he attempted neither to conceal nor to advertise his sexual orientation by his appearance. He occasionally disclosed his homosexuality to people he met socially, but he never disclosed it to Resendes or other Morningstar employees. In fact, when a co-worker, who also worked for Resendes, told Drumm that people were wondering if he was gay, Drumm responded that he was not. Drumm did, however, use his company laptop for personal e-mail correspondence, including many e-mails to and from a new romantic partner and others to non-Morningstar employees that suggested his sexual orientation.[1]

---

[1] Morningstar contends that it did not become aware of these e-mails until after Drumm's termination when, as a matter of practice, Resendes accessed Drumm's e-mail account to determine if there were any pending client matters to be resolved. Drumm asserts that Resendes's inconsistent testimony on how she became aware of the e-mails suggests that she actually had possession of the e-mails prior to Drumm's termination.

2

In April 2007, Morningstar conducted an institutional client feedback forum attended by both Rorer from E*Trade and Randy Goldman from Schwab. At that forum, Rorer discussed her satisfaction with the services provided by Wein, the sales director who replaced Drumm on the E*Trade account. Goldman subsequently expressed to Resendes her dissatisfaction with Drumm and asked Resendes to assign Wein to the Schwab account. Resendes declined to remove Drumm from the account and asked Goldman to be patient because Drumm was experiencing some personal problems. Resendes informed Goldman that she would discuss Drumm's performance with Drumm, which she did.

After the April 2007 meeting, Resendes also discussed Drumm's performance on the Schwab account with her supervisor, Elizabeth Kirscher. Resendes told Kirscher that she knew Drumm was having marital problems and wanted to give Drumm an opportunity to improve his performance.

In July 2007, Resendes rated Drumm's performance as "meets expectations," lower than the "exceeds expectations" from the year before. Resendes considered giving Drumm a lower rating but did not do so because she did not want to put him on a formal performance improvement plan.

It is undisputed that Drumm's most important assignment at that time was the renewal of Morningstar's contract with Schwab, which was due to expire on October 31, 2007. Renewals of such large contracts are complicated and time-consuming. Regional sales directors oversee many aspects of the contract renewal process and serve as the primary client contacts, but they also rely on other departments at Morningstar to perform certain tasks. Drumm contends, for example, that Morningstar's product management group was responsible for producing redlined versions of various contract drafts.[2]

Resendes first became aware of specific complaints Schwab had regarding the contract renewal process on October 1, 2007. Schwab cancelled a telephonic meeting with

---

[2] Morningstar disputes this contention; however, for purposes of considering Morningstar's motion for summary judgment, this Court construes the evidence in a light most favorable to Drumm. *See infra* p. 6 (discussing legal standard applicable to summary judgment motions).

3

Morningstar scheduled for that day because it had not received redlined versions of one document; it had not received an updated pricing sheet as requested; and the master amendment did not include changes Schwab had requested and considered critical. Over the next several days, Schwab continued to raise concerns about the contract documents it received from Morningstar, including repeated concerns about redlining.

Morningstar and Schwab had subsequent telephonic meetings regarding the contract renewal on October 8 and October 12, 2007. It is not disputed that these calls did not go well. On the October 8 call, Goldman expressed a series of frustrations, including the lack of redlined documents and that Morningstar had not provided Schwab with pricing information it had requested. Following the October 8 call, Resendes called Drumm and expressed dissatisfaction with the way in which the Schwab contract renewal was proceeding. Goldman was again very upset on the October 12 call. She even threatened to sign a one-year contract with Morningstar, rather than a three-year contract, which generally means that the client intends to search for a new provider.

Following the October 12 call, Goldman told Resendes that she no longer wished to work with Drumm. Resendes agreed to remove Drumm from the account, and Resendes and Goldman further agreed that Wein would be assigned to the account, as Goldman originally requested six months earlier.

On October 15, 2007, Resendes informed Kirscher, via electronic mail, of Goldman's request for a new regional sales director and Resendes's agreement thereto. Kirscher responded to Resendes that she had no objections. She also forwarded Resendes's e-mail to Tao Huang, Morningstar's chief operating officer and Kirscher's supervisor. Huang responded to Kirscher that he never thought highly of Drumm. Both Kirscher and Huang were traveling on business at the time.

After consulting with Morningstar's human resources department, as is common practice when significant performance issues arise, Resendes informed Drumm on October 17, 2007, that he had been removed from the Schwab account. On October 22, 2007, Resendes told Drumm that he would be placed on a performance improvement plan

but that she was confident he could succeed. No one else, including individuals from the product management group whom Drumm contends were responsible for producing redlined versions of draft contracts, was removed from the Schwab account or disciplined in any way.

Following Kirscher's and Huang's return to the office, they spoke about Drumm and decided to terminate him because two clients had requested his removal from an account for performance reasons. It is not disputed that Drumm is the only employee at Morningstar whose removal from an account was requested by two clients.

Resendes did not have the authority to terminate Drumm, nor did she participate in the decision-making. However, she agreed with the decision and, as Drumm's manager, it was her responsibility to inform Drumm of his termination. She so informed Drumm via telephone on November 1, 2007. A representative from Morningstar's human resources department also participated in the November 1 call. Both Resendes's declaration and Drumm's notes from the conversation indicate that Resendes informed Drumm that he was being terminated based on the E*Trade and Schwab accounts, his lack of attention to detail, and complaints of rude and condescending behavior.

Drumm contends that, although he never told Resendes that he is gay, her questioning of him on several occasions led him to believe that she suspected his true sexual orientation. In early 2007, Resendes questioned Drumm about his personal life after learning of the break-up of Drumm's marriage. She raised similar questions several weeks later. Drumm characterizes the nature of such questioning as intrusive, persistent, and skeptical of his intentionally vague responses. In September 2007, Drumm contracted food poisoning and visibly lost weight. Drumm asserts that Resendes twice invasively questioned him about his weight loss and appeared not to accept his response that he had a stomach virus. Drumm does not contend that either Kirscher or Huang knew or suspected that he is gay.

Drumm filed suit against Morningstar in San Francisco Superior Court on June 9, 2008. Morningstar timely removed the case to this Court on July 11, 2008; Drumm does not contest that removal was proper based on diversity jurisdiction. Drumm's complaint alleges four causes of action under California state law: discrimination, failure to take reasonable

5

steps to prevent discrimination, termination in violation of public policy, and failure to make immediate payment of wages upon discharge. The first three claims are based on Drumm's allegations that he was improperly fired based on his sexual orientation.[3] The fourth claim is based on Drumm's contention that he was paid neither for accrued and unused vacation time nor for commission he earned based on his work on the Schwab account. Morningstar has moved for summary judgment on all claims.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 322-23. However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party meets its initial burden, the opposing party must then "set out

---

[3] Although the complaint also alleges harassment based on sexual orientation, Drumm has abandoned any claims based on harassment. Pl.'s Resp. to Def.'s First Set of Interrogs. at 9-10 (Ex. H to McGarrity Decl.) (answering "No" to Interrogatory No. 14, which asked, "Do you contend that you were harassed based upon your sexual orientation during your employment with Defendant?").

6

specific facts showing that there is a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250.

**DISCUSSION**

**I.	Discrimination Claims**

Drumm's first three causes of action are based on his assertion that he was improperly terminated based on his sexual orientation, in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940. Because Drumm lacks direct evidence of discrimination, the parties agree that this Court should evaluate these claims under the three-part framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this framework, the plaintiff bears "the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000) (citations omitted). The plaintiff's burden at this stage is "not onerous," but the plaintiff "must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a [prohibited] discriminatory criterion." *Id.* at 355 (internal quotation marks and citations omitted; alteration in original). To establish a prima facie case:

> the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.

*Id.* If the plaintiff establishes a prima facie case, a presumption of discrimination arises and "the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to raise[] a genuine issue of fact and to justify a judgment for the [employer], that its action was taken for a legitimate, nondiscriminatory reason." *Id.* at 355-56 (internal quotation marks and citations omitted; alterations in original). If the

7

employer satisfies its burden, "the presumption of discrimination disappears. The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." *Id.* at 356 (citations omitted). Throughout, "[t]he ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." *Id.* (citations omitted).

Morningstar first argues that it is entitled to summary judgment on Drumm's discrimination claims because Drumm has failed to establish a prima facie case of discrimination. The Court need not and does not decide whether summary judgment on this basis would be proper because it concludes, for the reasons discussed below, that Drumm could not prevail on his discrimination claims even if he were to establish a prima facie case of discrimination.

Morningstar articulated a facially nondiscriminatory reason for Drumm's termination: that two clients had requested Drumm's removal from their accounts. Thus, to survive summary judgment, Drumm must present sufficient evidence to allow a reasonable trier of fact to determine that the articulated reason was a pretext for discrimination. This he has not done. Drumm does not dispute that two clients expressed dissatisfaction with Drumm's work as their contact at Morningstar and requested a new regional sales director. In addition, Drumm himself admits that an important part of his job was to "[e]stablish, nurture and skillfully maintain strong relationships with high-profile clients." Drumm Dep. at 75:11-76:1 & Ex. 29 to Drumm Dep. (Ex. B to McGarrity Decl.) (listing this on his resume as one of his accomplishments as a regional sales director at Morningstar and indicating that it would be important to prospective employers).

Viewing the facts in a light most favorable to Drumm, Drumm has successfully raised several issues of disputed fact; however, none of these disputes is material. For example, Drumm presents evidence that his overall sales numbers were favorable, but the evidence is clear that Morningstar terminated Drumm not based on his overall sales performance but, instead, based on the circumstances surrounding his removal from the E*Trade and Schwab accounts. *E.g.*, Kirscher Decl. ¶¶ 6-7; Ex. C to Kirscher Decl. (Oct. 30, 2007 e-mail from

8

Kirscher to senior management team stating the "key factors contributing" to Drumm's termination were "1. We recently removed him from the Schwab account per the client's request and manager's assessment/agreement. 2. We previously removed him from E*Trade account for similar reasons."). Drumm has also presented evidence that one of the reasons Rorer, the E*Trade account representative, was dissatisfied with Drumm's performance was that Resendes instructed Drumm to insist on a contracting strategy that was contrary to Rorer's wishes. However, this dispute is not material because Rorer also complained that Drumm was not responding to phone calls and did not attend meetings or conference calls, and that "time was passing and, you know, in this case, time was money." Rorer Dep. at 14:20-15:3 (Ex. A to Gaus Decl.). There is no evidence that Resendes was somehow responsible for Drumm's failure, or at least Rorer's perception of Drumm's failure, to meet Rorer's expectations regarding communication and attendance at meetings.

Similarly, it may be disputed whether Drumm or the product management group was responsible for providing redlined drafts to clients, but the undisputed evidence demonstrates that Schwab's dissatisfaction with Drumm was based on more than simply the failure to receive redlined drafts. Schwab also complained, for example, that it had not received updated pricing documents as requested, and that the updated documents failed to include significant changes requested by Schwab. *E.g.*, Oct. 1, 2007 e-mail from Richard Newbold to Resendes and Dan Waryck (Ex. E to Resendes Decl. & Ex. 112 to Drumm Decl.); *see also* Goldman Dep. 44:10-21 (Ex. E to McGarrity Dep.) (testifying that one of the improvements after Wein took over from Drumm was "[r]esponsiveness to questions, time – timely responses"). Additionally, Goldman complained of Drumm's performance in April 2007, six months prior to the October 2007 discussions about redlined documents. *E.g.*, Goldman Dep. at 14:6-15:6; Resendes Decl. ¶ 6.

While Drumm also argues that other individuals connected with the Schwab account were not terminated, disciplined, or even removed from the account, and he states in his declaration that other individuals had been removed from accounts in the past without being terminated, Drumm presents no evidence to contradict the testimony by Resendes, Kirscher,

9

and Huang that no other employee under their supervision had ever been asked to be replaced by more than one client. Resendes Decl. ¶ 54; Kirscher Decl. ¶ 12; Huang Decl. ¶ 7. Nor has Drumm presented any evidence that Kirscher and Huang, the two individuals who made the ultimate termination decision, had any knowledge or even suspicion that Drumm is gay prior to making the termination decision.

"[T]he great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." *Guz*, 24 Cal. 4th at 361 & n.24. A plaintiff must proffer "specific" and "substantial" evidence of pretext to overcome an employer's summary judgment motion. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003). For the reasons discussed above, the Court concludes that Drumm has not met this burden, and summary judgment to Morningstar on Drumm's discrimination claims is therefore proper.[4]

## II. Compensation Claims

Drumm's fourth cause of action is for failure to pay wages earned upon discharge, in violation of California Labor Codes sections 201 and 203. Section 201 provides that "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Labor Code § 201(a). Section 203 provides for penalties if wages are not paid in accordance with section 201. Drumm contends that he was paid neither for earned commission nor for accrued and unused vacation time. *See* Cal. Labor Code § 200(a) (defining "wages" to include commissions); *id.* § 227.3 (providing that

---

[4]Because the Court grants summary judgment to Morningstar on Drumm's first three causes of action, it need not reach Morningstar's argument that any damages Drumm might recover at trial should be limited based on after-acquired evidence that Morningstar asserts would have led to Drumm's termination. Such evidence includes e-mails sent by Drumm referring to Goldman as a "shit-head" and Resendes as a "bitch" whom Drumm wanted to see fail. Exs. D & E to Kirscher Decl.

10

"vested vacation shall be paid . . . as wages" upon termination). The Court addresses each claim in turn below.

### A. Commission

First, Drumm argues that Morningstar should have paid him a commission in excess of $100,000 earned on the Schwab account. It is undisputed that the operative commission plan states that:

> Data institutional sales reps who terminate their employment or whose employment is terminated by Morningstar, will be eligible to receive incentives that are due and owing as of their termination date, but not incentives that are not yet due and owing. For absence of doubt, reps will not be entitled to any commissions or other compensation under this plan after the termination of their employment with Morningstar.

Ex. T to Suppl. Resendes Decl. at 5. It is also undisputed that not all of the conditions listed in the operative commission plan for the accrual of a commission had been satisfied by the time Drumm's employment was terminated. *Id.* at 3; Drumm Dep. at 207:12-210:1.

Subsequent to the filing of Morningstar's motion but prior to the filing of its reply, a California appellate court decided *Nein v. HostPro, Inc.*, 174 Cal. App. 4th 833 (June 3, 2009). Morningstar's reply brief relied on *Nein*, and the Court discussed this case with the parties at oral argument. As Morningstar correctly observes, the *Nein* court held that the plaintiff was not entitled to commissions based on agreements finalized after his termination because the employment agreement expressly prohibited it: "That agreement provided that plaintiff would receive a commission 'with respect to all direct initial sales for which Employee is responsible.' It further provided that plaintiff 'will be eligible for commission pay . . . *so long as [he] remains employed with the Company as a Sales Representative*." *Id.* at 850 (alterations and emphasis in original). Morningstar's policy contains similar language, and the company argues that *Nein* thus forecloses Drumm's claim for unpaid commission.

However, this Court does not read *Nein* so broadly as to abrogate all prior case law establishing that an employee may be entitled to commission on a sale if he or she is the "procuring cause" of the sale – case law that Morningstar itself cited in its moving papers.

11

*E.g.*, Mot. at 23 ("Apart from the terms of the commission plan, Drumm nevertheless might be able to recover a commission if he could show that [he] was the 'procuring cause of the sale' . . . . (citing *Chamberlain v. Abeles*, 88 Cal. App. 2d 291, 295-96 (1948)). Although the *Nein* court concluded that the contract barred the plaintiff from receiving commission after he was terminated, the court's ruling does not appear to have foreclosed a claim for quantum meruit; the court stated simply that the only case cited by plaintiff in support of a quantum meruit claim failed to mention quantum meruit.[5] Like the plaintiff in *Nein*, Drumm also asserts that he is entitled to commission on the basis of quantum meruit. In addition, Drumm relies on a section from the California Division of Labor Standards Enforcement ("DLSE") policies and interpretations manual, which provides that "[w]here the termination is not a quit, but a discharge, the employee has been prevented from completing the duties and may be able to recover all or a pro rata share of the commissions." DLSE Enforcement Policies & Interpretation Manual § 34.8 (Ex. P to Gaus Decl.). Morningstar failed to offer any argument that reliance on this policy interpretation or on a theory of quantum meruit is no longer viable following *Nein*, nor has the company persuaded the Court that, as a matter of law, Drumm is not entitled to some commission even though he admits that the Schwab deal was not finalized until after his termination. Drumm has also raised a disputed issue of material fact as to whether he was the "procuring cause" of the renewal of the Schwab account. *See e.g.*, Drumm Decl. ¶ 32 ("All of the products contained in the renewal agreements were negotiated by me, not Ms. Wein, with the exception of the 401K Company data which I could have easily done once Schwab and Ms. Resendes made it a priority. All of the Data Elements in the final renewal were negotiated by me. All of the Service Level Specifications were negotiated by me."); Drumm Dep. at 210:18-24 (claiming that he did "tons and tons of stuff" on the Schwab account, including "discovery and contract work and meetings and e-mails

---

[5]The court's ruling on quantum meruit reads, in its entirety, as follows: "Plaintiff asserts that even if he was not entitled to a commission under the terms of his contract, he has a valid quantum meruit claim. However, the sole case he cites in support, *Willson v. Turner Resilient Floors* (1949) 89 Cal. App. 2d 589, 201 P.2d 406, does not address quantum meruit at all. It thus does not support his contention." *Nein*, 174 Cal. App. 4th at 854.

12

and correspondence and due diligence"). Consequently, Morningstar has failed to establish that summary judgment on Drumm's commission claim would be proper.

### B. Vacation and Sabbatical

Drumm next contends that he should have been paid for six weeks of accrued and unused vacation time. Pl.'s Resp. to Def.'s First Set of Interrogs. at 5 (Ex. H to McGarrity Decl.). He asserts that he accrued three weeks of vacation time each year plus a six-week sabbatical. Drumm Dep. at 211:11-15. Morningstar's time off and sabbatical policies were as follows:

> **Time Off**
> Everyone needs a vacation. Morningstar does not believe in dispensing two weeks each year with the command "Use it or lose it!" Instead, you decide when you need time off. When you do plan a vacation, it's your responsibility to make sure that your work is covered. You can do this by discussing your plans with your coworkers and checking with your manager. Although our vacation policy does not allow for time off to accumulate from one calendar year to the next, we encourage every employee to take at least three weeks vacation per year.
>
> . . .
>
> **Sabbatical**
> After four years of full-time employment at Morningstar, you can take six weeks paid leave to explore, experiment, or pursue any interest for which you could otherwise never find the time. What you do is up to you. We see the sabbatical as a way of saying thanks for helping us grow, and as a way to help you grow.

Ex. 30 to Drumm Dep. at 4.

#### 1. Time Off Policy

California statute provides that:

> whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served.

Cal. Labor Code § 227.3. In *Suastez v. Plastic Dress-Up Co.*, 31 Cal. 3d 774 (1982), the California Supreme Court held that "[t]he right to a paid vacation, when offered in an employer's policy or contract of employment, constitutes deferred wages for services

13

rendered. . . . [A] proportionate right to a paid vacation 'vests' as the labor is rendered." *Id.* at 784. The court explained that "[i]f some share of vacation pay is earned daily, it would be both inconsistent and inequitable to hold that employment on an arbitrary date is a condition precedent to the vesting of the right to such pay." *Id.* at 782.

Morningstar's time off policy, however, is not "typical" in that it does not provide that an employee earns a certain amount of vacation each year based on the employee's "length of employment with the company and the title or position the employee holds." *Id.* at 783. Instead, it merely encourages employees to take at least three weeks of vacation each year and to work with their co-workers and managers to determine when vacation would be appropriate. In other words, "[t]here is no set number of vacation days to which an employee is entitled," and "vacation does not accrue." Kimura Decl. ¶ 2. Whether an employee can take vacation at a specified time, as well as how much vacation an employee can take in any given year, is at the discretion of his or her manager. Kimura Dep. at 11:9-12:2 (Ex. F to McGarrity Decl.) (explaining that a manager must sign off on vacation, and an employee could, for example, take thirty days off in a year with his or her manager's approval, or a manager could deny a request to take one week off, even if the employee had taken no other vacation that year, if that week fell at a bad time in terms of work responsibilities). Consequently, vacation at Morningstar does not "vest" within the meaning of the California Labor Code, and Drumm has no claim for accrued and unused vacation under Morningstar's time off policy. Indeed, Drumm implicitly conceded this point by failing to respond, either in his opposition papers or at oral argument, to Morningstar's contention that vacation time at Morningstar does not "vest" within the meaning of the California Labor Code.

### 2. Sabbatical Policy

However, Drumm's claim based on the sabbatical policy is distinct. Unlike the time off policy, Morningstar's sabbatical policy clearly indicates that an employee earns six weeks of sabbatical after four years of full-time employment at the company. It is undisputed that Drumm worked at Morningstar for more than four years and therefore earned the right to take a six-week sabbatical.

14

Morningstar argues that it need not have paid Drumm for any unused sabbatical time because the sabbatical to which Drumm was entitled was not vacation, and that it therefore falls outside the scope of California Labor Code section 227.3, but the company has failed to persuade the Court that summary judgment on this ground is appropriate. The DLSE policies and interpretation manual provides that:

> [U]nder very limited circumstances sabbatical leave programs, which are in addition to the normal vacation available to an individual, will not be considered vacation subject to Labor Code § 227.3. The sabbatical plan must meet these criteria:
>
> 1. The sabbatical must be for an extended period of time beyond that which is normally granted for vacations;
>
> 2. The sabbatical may not replace or displace vacation normally earned but must be in addition;
>
> 3. Sabbatical leave may only be provided to high level managers and professionals in advanced fields;
>
> 4. The DLSE would look with disfavor on sabbatical leave which is granted too frequently.

DLSE Enforcement Policies & Interpretations Manual § 15.1.13 (Ex. P to Gaus Decl.) (citation omitted). Morningstar has presented no evidence that its sabbatical policy satisfies all of the above criteria. In particular, this Court cannot find on the record before it, and viewing the evidence in a light most favorable to Drumm, that Morningstar's sabbatical policy applied only to "high level managers and professionals in advanced fields." Accordingly, the Court cannot grant summary judgment to Morningstar on Drumm's sabbatical claim on grounds that Drumm had no vested right to six weeks of vacation created by Morningstar's sabbatical policy.

Morningstar argues that it is also entitled to summary judgment on Drumm's claims for unpaid vacation time because, even assuming Drumm was entitled to three weeks of vacation each year and a six-week sabbatical, the evidence demonstrates that none of that vacation time went unused. However, this is not an issue that the Court can resolve at the summary judgment stage. If Drumm is able to establish at trial that Morningstar's sabbatical policy did not satisfy the criteria for exception from California Labor Code section 227.3,

15

then he would have been entitled to six weeks of vacation time under that policy. Although Drumm does not contest that he took more than six weeks of vacation during his tenure at Morningstar,[6] it is not clear from the record whether any or all of the vacation time Drumm did take should count as part of the six-week sabbatical to which Drumm was entitled. Morningstar's own evidence demonstrates that a Morningstar employee can take as much vacation each year as his or her manager will allow, and it may be that all of Drumm's vacation time was approved under Morningstar's time off policy. Put simply, Morningstar has not demonstrated a lack of material dispute as to whether Drumm took any vacation time that would count against the six-week sabbatical he earned by working four years as a full-time Morningstar employee. Summary judgment on Drumm's sabbatical claim would therefore be improper.

**CONCLUSION**

Based on the above discussion, Morningstar's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Drumm's first three causes of action alleging discrimination, failure to take reasonable steps to prevent discrimination, and termination in violation of public policy. The motion is GRANTED IN PART and DENIED IN PART as to Drumm's fourth cause of action for failure to make immediate payment of wages upon discharge. As to this cause of action, the motion is GRANTED to as to Drumm's claim based on Morningstar's time off policy but DENIED as

//

//

---

[6] Morningstar contends that Drumm took the equivalent of 102.9 days off during his tenure at Morningstar, in addition to nearly the entire month of January 2007. Noer Decl. ¶ 3 & Ex. A (paralegal's compilation of vacation time based on the Microsoft Outlook account used by Drumm at Morningstar); Ex. E to Tipton Decl. (Feb. 13, 2007 e-mail from Drumm to a client indicating that "January has been pretty much a non work month for me"). Drumm counters that he did not take 7 vacation days between December 25, 2006, and January 1, 2007; 21 vacation days during January 2007; or 10 vacation days between April 2 and April 16, 2007. Drumm Decl. ¶ 36. However, even assuming Drumm worked the entire month of January 2007 and all of the other disputed days, he still would have taken well over six weeks of vacation based on the time records he does not dispute.

16

to his claim based on Morningstar's sabbatical policy and his claim that he is owed unpaid commission for his work on the Schwab account.

**IT IS SO ORDERED.**

Dated: 08/24/09

_____
THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT